**IN THE COURT OF APPEALS OF IOWA**

No. 25-0517
Filed October 29, 2025

**IN THE INTEREST OF A.J., Minor Child,**

**C.C., Mother,**
        Petitioner-Appellant,

**J.J., Father,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Tama County, Angie Johnston, Judge.

        A mother appeals the district court's denial of her petition to terminate a father's parental rights to their child under Iowa Code chapter 600A (2024). **REVERSED AND REMANDED.**

        Andrea M. Flanagan (argued) of Flanagan Law Group, PLLC, Des Moines, for appellant.

        Joseph G. Martin (argued), Cedar Falls, for appellee.

        Dusty L. Clements of Clements Law & Mediation, Newton, attorney and guardian ad litem for minor child.

        Heard at oral argument by Greer, P.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

A mother appeals the district court's denial of her petition to terminate a father's parental rights to their child under Iowa Code chapter 600A (2024). She claims the court erred in determining she failed to prove the father abandoned the child and in determining that termination of the father's parental rights was not in the child's best interests. The mother also challenges the court's order denying her counsel access to child-in-need-of-assistance files involving the father's other child. Upon our review, we reverse the district court's order and remand with directions to enter an order terminating the parental rights of the father.

## I.      Background Facts and Proceedings

The parents began a relationship in 2019, and their child A.J. was born in March 2021. The parents lived together with A.J., along with the father's older child from a previous relationship.[1] The parents separated in June or July of that year, at which time the mother and A.J. moved to the maternal grandparents' house in a neighboring town. The mother and A.J. occasionally visited the father over the next few months.

In December, the father was arrested for operating while intoxicated (third or subsequent offense), child endangerment,[2] driving while barred, and possession of a controlled substance (third offense). At that time, the father was on parole following his release from incarceration for operating while intoxicated

---

[1] That child was born in 2017; we refer to her as M.J.
[2] M.J. was in the father's vehicle at the time of the incident, precipitating the child-endangerment charge.

(third offense) and driving while barred. A warrant for his arrest was issued for his parole violation.

In February 2022, the father was arrested for a domestic abuse incident involving M.J.'s mother and M.J. While those charges were dismissed, the father was required to serve time for his parole violation and other matters. The father was released from prison in August 2023.

Meanwhile, in June 2023, while in prison, the father initiated two actions against the mother. The mother was served notice of only one of those actions; it sought, in part, to establish paternity testing for A.J. The father dismissed that action in September 2024.[3]

In May 2024, the mother filed a petition to terminate the father's parental rights to A.J., alleging the father had abandoned the child pursuant to Iowa Code section 600A.8(3) and termination of his parental rights was in the child's best interests. The matter came before the district court for a termination hearing over one day in October, during which the court heard testimony from the parents.

The parties agreed that the father had not seen A.J. since December 2021, when the child would have been approximately nine months old. They further agreed the father text messaged the mother on several occasions in early January 2022 regarding M.J.[4] The father testified he tried to contact the mother "[b]y the jail phone and letters" about M.J. and A.J. on other occasions but she did

---

[3] The other action sought, in part, to establish visits with A.J. upon the father's release from prison. The mother was not served notice of that proceeding, and it was dismissed in June 2024.

[4] The father testified he also asked about A.J., but the text messages introduced into the record showed correspondence only about M.J.

not respond. He stated he "tried to send money to her in one of the letters" in mid to late 2022, "but the money ended up going back on [his] books." He believed the mother had "blocked" him. The father acknowledged he had made mistakes that took him away from A.J., but he maintained, "I just want to be able to visit her and see her grow up." The father was awarded custody of M.J. via a bridge order following the closure of her child-in-need-of-assistance (CINA) case; he maintained it was important for A.J. to have a relationship with her half-sister.

The mother testified she had been in a relationship with her boyfriend Skyler for two years, and they had a one-year-old child together. The mother disputed that the father sent cards or letters from prison. She acknowledged that she eventually blocked him "[b]ecause of his harassment." The mother testified that the father repeatedly contacted her in attempts to initiate sex but never asked about A.J. The mother also stated that she was in contact with several of the father's family members until "recently"; the father knew other "options" to contact her if he wanted to; and she would have responded to his contact "[i]f it was about [A.J.]" The mother maintained that the child believed that Skylar was her father and it was in the child's best interests for the father's parental rights to be terminated. The mother testified that she received no financial support for the child from the father since the parties' separation.

The guardian ad litem recommended that the father's parental rights be terminated, opining in part:

> Although, the father appears to have turned his life around and is now doing well in life and caring for his other child, the fact is [A.J.] doesn't know him and he hasn't had contact with her until [sic] she was a few months old. The most telling moment during the undersigned's involvement in this case was when she asked [A.J.] to

name her parents, and she said her dad was Skylar. Skylar is who she knows to be her father. He is the father who provides her with the financial, emotional and physical support that she requires. The undersigned believes that if [A.J.] was reintroduced to [the father] at this point it would be detrimental to her and would not be in her best interest. Although [the father] was incarcerated until August of 2023, his actions obviously caused that incarceration and more telling is the fact that since August of 2023, he did not make any efforts to file a custody action or contact [the mother] to reengage with [A.J.] Although the father maintains that he didn't know where they were at, the mother has remained in the same small town and appears to have been easy to locate. It is the undersigned's opinion that [the father] needed to take immediate action once he was released from prison to reestablish a relationship and be a part of his daughter's life.

Following the hearing, the district court entered an order concluding the statutory grounds for termination had not been met. Although the court observed "[i]t is undisputed that [the father] has not visited with or spoken to [A.J.] since she was nine months old (December 14, 2021)" and "[t]here is no father-daughter bond between [them] at this time," the court found that the mother "block[ed] all forms of contact from [the father] and he did not have an alternate means of contact [with A.J.] except through [the mother]." The court further determined termination was not in the child's best interests, stating "termination of rights at this point seems premature. [A.J.] is three years old. There is a lot of time for [the father] to develop a relationship with her." Accordingly, the court denied the mother's petition to terminate the father's parental rights. The mother appeals.

## II.     Standard of Review

We review termination proceedings under Iowa Code chapter 600A de novo. *In re J.V.*, 13 N.W.3d 595, 603 (Iowa 2024). Although we are not bound by the district court's fact findings, "we do give them weight, especially in assessing

the credibility of witnesses." *Id*. The best interests of the child is our paramount concern. Iowa Code § 600A.1(1).

## III. Analysis

"Private termination proceedings under Iowa Code chapter 600A are governed by a two-step process. The petitioner first must prove by clear and convincing evidence the ground for termination, and then must prove by clear and convincing evidence that termination is in the best interests of the child." *J.V.*, 13 N.W.3d at 603.

### A. Abandonment

Chapter 600A authorizes the district court to terminate a parent's rights if the parent has abandoned the child. Iowa Code § 600A.8(3). Abandonment of a child occurs when "a parent . . . rejects the duties imposed by the parent-child relationship, . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." *Id.* § 600A.2(20). Specifically, a parent is deemed to have abandoned a child six months of age or older

> unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

*Id.* § 600A.8(3)(b).  Accordingly, the mother has the burden to establish that the father either (1) failed to contribute financially to A.J.'s support in a reasonable amount according to his means or (2) failed to maintain "substantial and continuous or repeated contact" with A.J.  *See id.*; *accord J.V.*, 13 N.W.3d at 604.

We elect to focus on the financial aspect of the statute.  First, we may conclude the father abandoned A.J. due to lack of financial support without reaching his assertions that the mother prevented his contact with the child.  A parent's lack of financial support is the initial test for abandonment.  *See In re K.W.*, No. 14-2115, 2015 WL 6508910, at *3 (Iowa Ct. App. Oct. 28, 2015) ("Under section 600A.8(3)(b), the threshold element of 'substantial and continuous or repeated contact' is economic contributions.").  So, if the father abandoned A.J. under the financial-support prong, we need not consider whether the mother prevented contact by the father.  Iowa Code § 600A.8(3)(b)(1), (2); *see In re G.D.*, No. 20-0984, 2021 WL 2126174, at *3 (Iowa Ct. App. May 26, 2021) ("Substantial and continuous or repeated contact with the child is shown by: (1) financially contributing to the support of the child in a reasonable amount according to the parent's means ('cash'), and (2) maintaining sufficient contact with the child as defined in section 600A.8(3)(b)(1)–(3) ('contact').  For a parent to avoid being deemed to have abandoned the child, the parent must meet *both* the cash and contact components of the statute.").

The undisputed evidence shows that the father did not provide financial support for A.J.  He alleges he attempted to send money to the mother on one

occasion in 2022 but that money was placed back on his books.[5] Even accepting this one attempt as truthful, the record is void of any other financial support since the parties' separation. While he was incarcerated for a period, it is undisputed he provided no financial support for the child after the parties' separation, either prior to his incarceration or after. The father was released from prison in August 2023. The termination proceeding was held over a year after his release. At the time of the termination hearing, he reported that he was working as an electrician. And yet, he paid no sums of money for the support of A.J. Given the age of the child at the time of the termination hearing, we conclude that the father failed to contribute financially to A.J.'s support in a reasonable amount according to his means. The father abandoned A.J. within the meaning of Iowa Code 600A.8(3).

## B.      Best Interests

Because a ground for termination has been established, we turn to whether the mother showed by clear and convincing evidence that termination is in A.J.'s best interests. *See In re O.W.*, No. 24-0862, 2025 WL 52452, at *8 (Iowa Ct. App. Jan. 9, 2025). "Termination may not occur unless it is in the best interests of the child." *J.V.*, 13 N.W.3d at 607. Although our paramount consideration is the child's best interests, we must also give due consideration to the interests of the parents. *See* Iowa Code § 600A.1(1). For purposes of this proceeding,

> [t]he best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed

---

[5] At oral arguments, counsel for the father indicated the amount of this one-time attempted payment was $25.00. Because the amount is outside the appellate record, we do not consider such in our analysis, but only the testimony from the father that he attempted to "send money to [the mother] in one of the letters" in 2022.

the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

*Id.* § 600A.1(2).

We also borrow from the statutory best-interests framework in Iowa Code section 232.116(2) in private termination proceedings. *B.H.A.*, 938 N.W.2d at 232. That is, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

On this question, the mother claims that "[f]rom the time of the parties' separation in December 2021 through the date of trial, [the father] has failed to demonstrate a genuine interest in maintaining contact with [A.J.]" and "[h]e has not paid any financial support for the benefit of [A.J.]" during that time. Although the father maintains that termination "would cut off A.J. from the potential for support" from him in the future, the fact remains that the father's "chosen lifestyle" hindered his ability to have a relationship with A.J. or financially provide for her during most of her young life. *See B.H.A.*, 938 N.W.2d at 234 (observing the father's "chosen lifestyle was at the expense of a relationship with [the child]"). We also share the mother's concern about the "pattern" of the father's criminal behavior and incarcerations, which she believes "will undoubtedly result in further chaos and inconsistency for [A.J.] if [the father's] rights are not permanently terminated." *See In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981) (observing "evidence of the parent's past performance . . . may be indicative of the quality of the future care

that parent is capable of providing").  Indeed, the father's two most recent arrests involved incidents during which his child M.J. was present.

In determining termination of the father's parental rights was not in A.J.'s best interests, the district court relied heavily on the potential that A.J. could "develop a meaningful relationship with [the father]" in the future.  While that may be true, "[a]side from speculation that [the father] may develop an active relationship with [A.J.] in years to come, the record is virtually devoid of any meaningful evidence that terminating [his] parental rights would be detrimental to [A.J.] due to any alleged closeness of the relationship."  *See B.H.A*., 938 N.W.2d at 234.

Further, although the record does not indicate that adoption is in A.J.'s future, it shows the mother and Skylar have lived together for several years, Skylar is a father figure to A.J., the mother's child with Skylar is A.J.'s half-sibling, and Skylar is a financial provider for the family.  *See id*. (observing although "it is uncertain whether adoption" is in the child's future, the family "enjoy[s] family activities" with the mother's boyfriend, who "visits almost every day," and his "role as a parental figure to [the child] has met, if not exceeded, any role assumed by [the father]").  As the guardian ad litem pointed out, A.J. "sees Dad as Skylar."  *See id*. (viewing the child's "unsolicited term of endearment towards [the mother's boyfriend] as a healthy indicator of attachment").  And it is undisputed that the child does not know her biological father.

For these reasons, we reverse the district court's order and remand with directions to enter an order terminating the parental rights of the father consistent with this opinion.[6]

**REVERSED AND REMANDED.**

---

[6] Due to our disposition of the merits of the mother's claim, we do not address her challenges to the court's order preventing her counsel access to child-in-need-of-assistance files involving the father's other child or the district court's consideration of those files in its ruling.